OF THE

## STATE OF NEW JERSEY,

## ON APPEAL FROM THE COURT OF CHANCERY,

### AND PREROGATIVE COURT,

#### JUNE TERM, 1889.

————

HENRY GEORGE et al., appellants,

*v.*

WILLIAM S. BRADDOCK, executor &c., respondent.

A bequest or devise to educate the public in any branch of science by the dissemination of the works of a given author, is a good charitable use, provided such works contain nothing hostile to morality, religion or law.—*Held*, that such a testamentary disposition, for the purpose of circulating the works of Henry George on the land question &c., was a valid charitable use.

————

On appeal from a decree advised by Vice-Chancellor Bird, whose opinion is reported in *Hutchins* v. *George, 17 Stew. Eq. 124.*

George *v.* Braddock.

"*Lastly.* All the rest and residue of my estate, of any and every form, kind and description whatsoever, I hereby give, devise and bequeath, under the name of 'The Hutchins' Fund,' to Henry George, the well-known author of 'Progress and Poverty,' his heirs, executors and administrators, in sacred trust, for the express purpose of 'spreading the light' on social and political liberty and justice in these United States of America, by means of the gratuitous, wise, efficient and economically conducted distribution all over the land of said George's publications on the all-important land question and cognate subjects, including his 'Progress and Poverty,' his replies to the criticisms thereon, his 'Problems of the Times,' and any other of his books and pamphlets which he may think it wise and proper to gratuitously distribute in this country; provided, first, that said George, his heirs, executors and administrators, shall regularly furnish true annual reports of the management and disbursement of the said 'Hutchins' Fund' to the paper called 'The Irish World and the American Industrial Liberator,' or its acknowledged successor, and shall also annually mail or otherwise send a copy of said paper containing such annual report, to each of the following persons, to wit, my aforementioned wife, Mary Hutchins, now of this place; William S. Wood, now of Parker, county of Randolph, State of Indiana, and James Hutchins, now of Selma, county of Delaware and State of Indiana; and provided, second, that said George, his heirs, executors and administrators, shall cause to be inserted or printed opposite the title page of every free copy of his books distributed by means of this fund, this my solemn request, virtually, to wit, that each recipient shall read it and then circulate it among such neighbors or other persons as in his best judgment will make the best use of it."

*Mr. John T. Woodhull, Mr. Samuel W. Beldon* and *Mr. James F. Minturn,* for the appellant.

*Mr. George A. Vroom,* for William S. Braddock.

*Mr. S. C. Woodhull* and *Mr. D. J. Pancoast,* for Mary Hutchins.

*Mr. C. V. D. Joline,* for James Hutchins.

The opinion of the court was delivered by

BEASLEY, C. J.

This is an executor's bill, seeking a judicial exposition of the last will, which he is called upon to execute.

The instrument in question was executed by one George Hutchins, whose domicile, at the time of his death, was in this

George v. Braddock.

State. It is dated the 28th day of February, 1887, and it contains a residuary clause that is set forth at large in the statement of facts prefacing this opinion. In that clause the testator has set apart property to be devoted to the propagation of certain designated works, as will hereafter appear, and the question propounded to this court is, whether such testamentary disposition is to be established as a charitable use.

It is familiar learning that, from the enumeration of certain subjects in the statute of Elizabeth, and from the judicial expositions of that act, there have been evolved certain defined classes of testamentary gifts that are now universally admitted to be, in the estimation of the law, charitable uses. With regard to such classes, debate and doubt have ceased; and, consequently, all examination of the grounds upon which such classification has been justified would, at the present time, be profitless, and nothing better than empty pedantry. For, it is obvious, that the instance now before this court, belongs, so far as the testamentary intent is concerned, to one of such established classes. The testator's direction is, that the property designated by him shall "constitute a sacred trust for the express purpose of spreading the light on social and political liberty and justice in these United States of America." That such a purpose is a charitable use, according to the legal import of those terms, is self-evident, in view of the present state of the decisions on that subject.

Consequently, if there be any illegality in this testamentary disposition, of necessity, it must reside in the methods contrived by the testator for the fulfillment of such legitimate purpose. Those methods are described by the testator in these words, viz.:

"The gratuitous, wise, efficient and economically conducted distribution all over the land of said George's publications on the all-important land question and cognate subjects, including his 'Progress and Poverty,' his replies to criticisms thereon, his 'Problems of the Times,' and any other of his books and pamphlets which he may think it wise and proper to gratuitously distribute in this country."

It is now urged that the doctrines taught in the works thus designated are of such a character that the court will not permit their dissemination.

George *v.* Braddock.

The inquiry thus started should be preceded by a consideration of the rule or test applicable in such affairs.

It is plain that such rule has but little to do with the ordinary canons of criticism. For present purposes, the scientific or literary value of these works is not to enter into the account. If I should say that I have concluded, which is the truth, that these works of Mr. George have greatly elucidated and enriched, in many ways, the subjects of which they treat, and that they are very valuable contributions to the science of economics, it would not be shown that a step had been taken in the path of present duty. It is not to be doubted that the public circulation, by virtue of a charitable use, of the works of Sir Robert Filmer, which maintain the divine right of kings, would be entitled to the judicial *imprimatur* equally with a treatise on government under the signature of John Locke. It matters not in the least to judicial inquiry whether the instrumentalities appointed by the donor to fulfill his purpose be good or bad, fit or unfit; whether they be the best possible, or the worst possible. In this particular the largest discretion resides, and properly resides, in the creator of the trust. These public benefactions are properly regarded as matters of great interest to the community; as entitled to the most favorable reception by the courts, and to their amplest protection. It is not surprising, therefore, that it has heretofore been understood that the entire restriction imposed by the law on such donations is that comprised in a single sentence: the writings to be circulated must not be, when considered with respect to their purpose and general tendency, hostile to religion, to law, or to morals. The rule, in this definite form, in my opinion, has been, by repeated adjudications, thoroughly established; and the only difficulty inherent in the subject is to properly select the writings to which it is applicable.

Regarding, then, this principle of proscription as settled, the question arises, has it been applied by the vice-chancellor in the present instance?

It has not been, and could not be, reasonably alleged that the writings now in question are either sacrilegious or immoral; but the argument proceeded exclusively on the theory that the doc-

George *v.* Braddock.

trines they teach are antagonistic to the law. It was urged, that this was the case by reason of the hypothesis of this author respecting the title to land. The view on that subject expressed by Mr. George is, that the earth belongs to mankind, and is a heritage that is inalienable, and that, consequently, one generation, or a series of generations, of men cannot, either by act or omission, debar a succeeding generation from claiming its own. The doctrine, therefore, inculcated is, that no private, absolute ownership in land can rightfully exist, the consequence being that the public, as the real proprietor, has the right to regain possession of all property of this nature by the use of any legal method.

The decree appealed from avoids the charitable use attempted to be created, and the principle of decision is thus stated in the opinion pronounced—the vice-chancellor says: "Clearly, the author, in these passages, not only condemns existing laws, but denounces the fact that the secure title to land in private individuals is robbery—is a crime. It is this aspect of the case which leads me to the conclusion that the court ought to refuse its aid in enforcing the provisions of this will. Whatever might be the rights of the individual author in the discussion of such questions in the abstract, it certainly would not become the court to aid in the distribution of literature which denounces as robbery—as a crime—an immense proportion of the judicial determinations of the higher courts. This would not be legally charitable. Society has constituted courts for the purpose of assisting in the administration of the law, and in the preservation of the rights of citizens, and of the public welfare; but I can conceive of nothing more antagonistic to such purpose than for the courts to encourage, by their decrees, the dissemination of doctrines which may educate the people in the belief that the great body of the laws which such courts administer, concerning titles to land, have no other principle for their basis than robbery."

A single glance at the rule of judgment here propounded will suffice to show that it is one of entire novelty. It does not appear to have been suggested, or even alluded to, in any former consideration of the subject. Stripped of unnecessary terms, in

its ultimate analysis, it promulges this far-reaching principle, that a court of law will not, in view of the purposes for which it was instituted, lend its aid, by its decree, to the agitation of the question whether the laws which it is in the habit of executing have or have not any better foundation than wrong and injustice. In this analysis, I have, of course, disregarded the presence of the term " robbery " in the foregoing quotation, that gives the ratio decidendi in the court below, because I am well aware that the learned vice-chancellor did not put his judgment, either in whole or in part, upon a mere epithet, or turn of phrase. I have also put, in a general form, the judicial proposition, because it would be manifestly absurd, to declare that the courts will not assist in providing for a discussion of the existing title to land, but that such refusal does not extend to the discussion, in a similar way, of the title to personalty and personal rights. It seems inevitable that the proposed principle of judgment must be applicable to the whole field of established law, if it be applicable to any part of it.

And, before leaving this formula that embraces the ground of decision in the court below, it is important to observe that its expressions convey the idea that all that the court does or is required to do in these instances is to refuse to *aid* in the circulation of the writings that are impugned, and that, in this respect, they are misleading ; for what the court does, is to adjudge that it is not permissible for any person to make provision for such circulation. The decree in this case frustrated the will of this testator; declared his trust void, and diverted the property invested in it, in other directions. It would seem, therefore, that the rule in question should have been, and, if it is to be adopted, must be, thus formulated : that a court of equity will not permit the fulfillment of a testamentary use that is designed to circulate works that call in question any of the fundamental rules and establishments of the law.

The vice-chancellor educes this principle from a consideration of the functions and constitution of judicial tribunals ; and, if I were to stand on that ground and indulge in speculation, it must be confessed that my conclusion would be the opposite of that

George v. Braddock.

which he has arrived at. I cannot perceive for what reason it is incompatible with judicial position to aid, if invested with such power, in the circulation of the works of a learned and ingenious man, putting under examination and discussion any part of the legal system. It would not seem to me that, as a judge, I was called upon to discard the use of means in the development of the law, which, in every other science, are regarded as absolute essentials. With respect to all intellectual creations, embracing, of course, laws and judicial institutions, the most potent of all forces tending to improvement and evolution are those of examination and discussion, and recognizing them as the motive agents of progress, I should very confidently have concluded that it was neither proper nor becoming in me, as a judge, to refuse to this testator the right to use them in this instance.

The testator's scheme was designed to be educational with respect to an important branch of legal and economic science, and, in his opinion, the circulation of the works of Mr. George would contribute to the accomplishment of that purpose. Therefore, viewing the subject from the standpoint suggested, I could not, in the line of judicial duty, have sanctioned a principle that, while it would repress the dissemination of the writings of Mr. George, would undoubtedly lend its aid to the circulation of the reply of the Duke of Argyle thereto, on the ground that the former are aggressive towards the legal establishment in question, while the monograph of the latter, on that subject, tends to quietism and public acquiescence. In such a situation, if I had possessed the power, I should not only have sanctioned, but have favored, the propagation of any or all of these works, in the conviction that such discussions advance the cause, not of error, but the cause of truth.

If, therefore, I were to accept the principle of judgment adopted by the vice-chancellor, I should have been obliged to dissent from his conclusion.

But, waiving such considerations, let us turn to the question, how far the principle of decision under criticism will stand the touch of judicial authority.

According to the theory indicated and, in some degree, expounded in the beginning of this opinion, it is attempted to be shown that, on such occasions as the present, the *index expurgatorius* to be applied by the court is formed on the principle that only such works are to be proscribed as manifestly tend to violations of law or to the corruption of morals or religion. To this catalogue the court below, as has appeared, added a class comprising such writings as a court, from its inherent nature, could not properly or becomingly aid in circulating.

It is evident that this extension of the rule will not harmonize with any of the adjudged cases. A reference to two of such authorities will be a sufficient illustration. Both of these decisions are cited in the briefs of counsel, and are referred to in the opinion of the vice-chancellor without hostile comment. The first to which attention will be called is that of *Thornton* v. *Howe, 31 Beav. 14*. It was a case embracing a charitable use, and the words of the bequest were, " to propagate the sacred writings of Joanna Southcote." The argument took place before Sir John Romilly, who, upon looking into the works in question, found that their authoress was under the delusion that she was with child by the Holy Ghost ; that she had conversations with the devil, and inter-communings with the spiritual world. In view of these things, the master of the rolls said : " I have found much that, in my opinion, is very foolish, but nothing which is likely to make persons who read them either immoral or irreligious. I cannot, therefore, say that this devise of the testatrix is invalid by reason of the tendency of the writings of Joanna Southcote." And, afterwards, his further declaration is : " But if the tendency were not immoral, and although this court might consider the opinions sought to be propagated foolish or even devoid of foundation, it would not, on that account, declare it void, or take it out of the class of legacies which are included in the general terms, charitable bequests."

It needs no comment to show that this decision is irreconcilable with the rule upon which the present case has been decided. The master of the rolls, concluding that the tendency of the works was not immoral or irreligious, assented to their circula-

tion, although he was satisfied that the doctrines taught by them were foolish and without foundation.

The second authority to which I shall refer is that of *Jackson* v. *Phillips*, reported in *14 Allen 539*. This controversy also related to a charitable use, the bequest being of a fund to trustees, " to be expended at their discretion in such sums, at such times and such places as they may deem best, for the preparation and circulation of books, newspapers, the delivery of speeches, lectures and such other means as, in their judgment, will create a public sentiment that will put an end to negro slavery in this country." The decision of the court, in its own language, was (*p. 566*): " The bequest itself manifests its immediate purpose to be to educate the whole people upon the sin of a man's holding his fellow-man in bondage; and its ultimate object, to put an end to negro slavery in the United States; in either aspect, a lawful charity."

It is conspicuous that this decision is diametrically opposed to the rule under criticism. In the present case, the decision was that the court would not help in the circulation of books that strove to show that private ownership in lands, the validity of which had been repeatedly recognized by the courts, had no better foundation than robbery. In the reported case, the court helped the dissemination of writings whose object was to prove that the ownership of human beings, which was a species of property established by the federal constitution itself, and sustained as such by repeated judgments both in the national and state courts, had no better foundation than sin.

The legal rule imposing limits on charitable uses is one of great importance; and, influenced by that consideration, I have examined, with care, the principle upon which the present case has been decided, and my conclusion is, that such principle does not consist with the authorities, and if it were adopted by this court would be productive of serious mischief. If sanctioned, the subject, with respect to the rights of donors in this field, would be involved in clouds and darkness, for instead of a rule we would have a speculation. By force of the prevalence of such a change, it may well be doubted whether it would not be

altogether impracticable to disseminate, by means of a charitable use, the works of any of the leading political economists, either of the present or past age, for it is believed that none can be found that do not, in material particulars, make war, more or less aggressive, upon some parts of every legal system as it now subsists. Certain it is that neither the "Political Economy" of Mr. Mill, nor the "Social Statics" of Mr. Herbert Spencer, could be so circulated, for each of these very distinguished writers denies the lawfulness of private ownership in land. A principle bearing such fruits could not properly be introduced into our legal system, except upon the compulsion of irresistible authority.

It is obvious that, by the application of the ordinary test, and which it has been thus insisted is, and always has been, the legal test, the works now in question do not come under the proscription of the law. It has been heretofore stated that they do not tend to the corruption of morals or religion, and it is equally evident that they are not opposed to any legal rule or ordinance. What these writings are calculated, and were intended, to effect is, to cause the repeal, in a legitimate mode, of the laws at present regulating the title to land and the substitution of a different system. It would seem to be quite out of the question for this court to declare that such an endeavor is opposed to the law, for it is simply a proposition to alter the law according to the law.

The charitable use created in this will must be sustained, and the decree appealed from, to that end, must be reversed.

*Decree unanimously reversed.*